FILED
CLERK

2:43 pm, Sep 27, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

----------------------------------------------------------------X

VANESSA DE ABREU,

                Plaintiff,                            **MEMORANDUM & ORDER**
                                                              18-CV-2686 (JMA)(ARL)

        v.

JOHNSON CONTROLS FIRE PROTECTION LP
and BRIAN KANNETT,

                Defendants.

----------------------------------------------------------------X

APPEARANCES:

    David H. Green, Esq. and Christine Malafi, Esq.
    *Attorneys for Plaintiff*
    Campolo, Middleton & McCormick, LLP
    4175 Veterans Memorial Highway, Suite 400
    Ronkonkoma, New York 11779

    Brian D. Lee, Esq. and Jennifer Rygiel-Boyd, Esq.
    *Attorneys for Defendant Johnson Controls Fire Protection LP*
    Ogletree, Dakins, Nash, Smoak & Stewart, P.C.
    599 Lexington Avenue, 17th Floor
    New York, New York  10022

    Jason L. Abelove, Esq.
    *Attorney for Defendant Brian Kannett*
    Law Office of Jason L. Abelove, P.C.
    666 Old Country Road, Suite 303
    Garden City, New York  11530

AZRACK, District Judge:

    Plaintiff Vanessa DeAbreu ("Plaintiff" or "DeAbreu") commenced this action against her

employer, Defendant Johnson Controls Fire Protection LP ("JCFP"), and co-worker Brian

Kannett[1] ("Kannett") (collectively "Defendants")[2] asserting four causes of action:   gender discrimination and harassment/hostile work environment against JCFP in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") , 42 U.S.C. § 2000e *et seq.,* and the New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. L. § 290 *et seq.,* intentional infliction of emotional distress ("IIED") under state law against all Defendants, and false imprisonment under state law against Kannett.   Currently before the Court are motions for summary judgment filed by Defendant Kannett, see ECF No. 43, and JCFP.   See ECF No. 44.   JCFP has also moved for leave to file certain exhibits to its motion under seal.   See ECF No. 45.   For the reasons set forth below, the motions are granted in part and denied in part.

## I.  BACKGROUND

### A.  Factual History[3]

#### 1.  The Parties

Defendant JCFP sells fire suppression systems to government and commercial customers.

According to JCFP, it was previously known as SimplexGrinnell LP prior to a corporate merger

---

[1] The Court uses the spelling of Kannett's first name from the complaint, noting that, in various places throughout the parties' submissions, it is alternatively spelled "Bryan."

[2] Defendants Tyco International PLC, Johnson Controls Inc., and Johnson Controls International PLC were dismissed from this action.   See ECF No. 23.   In addition, the parties have agreed that "Johnson Controls Fire Protection LP, f/k/a SimplexGrinnell LLP, is the proper employing entity/corporate defendant." Id.   The Clerk of the Court is directed to amend the caption as indicated above.

[3] The facts, which are undisputed unless otherwise noted, are drawn from: JCFP's Separate Statement of Material Facts ("Def. 56.1 Stmt"), ECF No. 44-1; Plaintiff's Statement Controverting Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Resp."), ECF No. 44-17; Plaintiff's Counter/Additional Statement of Facts ("Pl. 56.1 Stmt."), ECF No. 44-17; JCFP's Response to Plaintiff's Separate Statement of Additional Material Facts ("Def. 56.1 Resp."), ECF No. 44-33; the Certification of Jennifer Rygiel-Boyd in Support of Defendant's Summary Judgment Motion ("Rygiel-Boyd Cert."), ECF No. 44-3, and exhibits thereto; and the Certification of David H. Green in in Opposition to Defendants' Motions for Summary Judgment ("Green Cert."), ECF No. 44-18, and exhibits thereto.   Kannett has not provided a separate Rule 56.1 statement, but instead attaches and "refers the Court to the Defendants' joint FRCP 56.1 statement for a full recitation of the facts of this case."   See Kannett Memorandum of Law in Support ("Kannett Mem."), ECF No. 43-1 at 1.

between that company's parent company, Tyco International, and JCFP's parent company, Johnson Controls, Inc.  It maintains an office in Hauppauge, New York.  Def. 56.1 Stmt ¶2. Plaintiff began working at the company's Hauppauge office in May 2013 as a Systems Intake Review Representative or Systems Integrity Representative.  Def. 56.1 Stmt ¶3.  The job is a sales position that requires contact with customers and providing quotes for work.  Id. ¶4.  Kannett also worked for JCFP as a sales employee, although Plaintiff disputes that they worked "similarly." Compare id. ¶5 with Pl. 56.1 Resp. ¶5.  Both DeAbreu and Kannett maintained offices at the Hauppauge location during the events leading to this litigation.  Def. 56.1 Stmt ¶6.  Id.

JCFP has an Equal Employment Opportunity/Affirmative policy and a Harassment Free Workplace policy, both of which contain procedures for employees to file internal complaints of harassment and/or discrimination.  Def. 56.1 Stmt ¶¶8-10.  DeAbreu completed Vital Values training which included training on the policies and complaint procedures.  Id. ¶12.

2.  The 2013 Incident[4]

In 2013, DeAbreu went on a sales call with Kannett to Good Samaritan Hospital.  Pl. 56.1 Stmt ¶4; Plaintiff's Deposition ("Pl. Dep.") at 148:2-4, Green Cert. Ex. 1, ECF Nos. 44-19, 44-20.[5]  According to DeAbreu, as they were getting into the car to leave after the sales call, Kannett pulled off to a side parking lot "and he said he wanted me to watch him jerk off.  And I said 'Absolutely not, that's disgusting,' and he told me he would leave me in the parking lot and I said that I really didn't care."  Pl. Dep. at 148:12-20.  Kannett drove her back to the office.  Def. 56.1 Stmt ¶27.

---

[4] The event that occurred at some unspecified time in 2013 as set forth in this section will hereinafter be called the "2013 Incident."

[5] Citations to the deposition transcripts referenced in this Order are to the full transcripts provided by Plaintiff rather than the excerpted pages provided by JFCP, and indicate the page and line numbers therein.

Plaintiff complained about this incident to Daisy Aspromonti, a former HR Manager, Def. 56.1 Stmt ¶28, but she did not remember talking with anyone else about the incident.  Pl. Dep. 154:3-6.  Aspromonti said she would talk to Kannett, id. at 149:11-13, and later told Plaintiff that "she took care of it."  Id. at 153:12.  Kannett disputes that the 2013 Incident happened and testified that he was never asked about it by anyone at the office.  Kannett Dep. 43:12-16.  Neither party has submitted an affidavit or sworn testimony from Aspromonti, who is no longer employed by JCFP.

Plaintiff did not file a charge with the EEOC regarding the 2013 Incident.  She testified that she was not involved in any sexual harassment events with Kannett between the 2013 Incident and an incident that occurred on May 15, 2017.[6]  Pl. Dep. 154:21-23.

4.  The 2017 Incident

Plaintiff commenced a sale to a customer, Blue Lynx, located in Yaphank.  Pl. Dep. 155:4-24.  The fire marshal required something additional that Plaintiff "didn't have the capability of selling."  Id. at 155:18-21.  She notified a manager, James Contrada, that she needed someone to assist her on the sale and he assigned Kannett.  Id. at 166:9-14.  Plaintiff told Contrada that she did not want to work with Kannett, that she did not feel comfortable with him, and that he makes inappropriate comments.  Id. at 168:5-6, 17-20.  She did not go into any detail about the nature of the comments.  Id. at 167:7-8.  Contrada told her she had to team with Kannett and that it's "part of the job."  Id. at 166:18-19.

On May 15, 2017, DeAbreu and Kannett drove, in Kannett's car with Kannett driving, from the office in Hauppauge to and from Blue Lynx's facility in Yaphank.  They agree that on

_____

[6] The incident that took place on May 15, 2017 will be referred to hereinafter as the "2017 Incident."

4

the way to Blue Lynx, Kannett asked if they could stop at DeAbreu's house for lunch and DeAbreu declined.  Def. 56.1 Stmt ¶14.

After visiting the customer, they returned to Kannett's car, with Kannett again driving and DeAbreu in the passenger seat.  They exited the parking lot at about 12:24 p.m. and headed toward the Long Island Expressway ("LIE").  Def. 56.1 Stmt ¶15.  Plaintiff states that the following exchange took place:

> We were driving back and he said, as we were pulling onto the highway, "Hey, I want you to watch me play with my balls." I was like, "That's disgusting.  Absolutely not.  I am not watching you play with your balls."  He's like, "I am not asking you to touch it or them, I am just asking you to watch." And I said, "You need to stop, this is like inappropriate.

Pl. Dep. at 188:24-198:11.  They then had an exchange in which: (1) Kannett asked her how the sales call went, (2) DeAbreu responded, (3) Kannett said "You're an idiot," and (4) she replied "Don't call me an idiot.  I don't appreciate that."  Id. at 186:18-187:13.  Kannett then repeated his request to watch him play with his balls, and Plaintiff asked to be let out of the car.  Id. at 189:21-24.  Even though they were on the LIE, Plaintiff said Kannett could pull right over "because I lived right close there" and that she could walk home or to Target or Sam's Club or have her boyfriend pick her up.  Id. at 190:2-10.  Plaintiff asserts that Kannett refused to let her out of the car, saying he couldn't let her go because she would tell somebody and "it would ruin him."  Id. at 455:9-11.  Kannett testified that DeAbreu asked to be driven home, but did not ask to be let out by the side of the road, in a parking lot, or at a friend's house.  Kannett Dep. 31: 2-10.

After Kannett's comments and Plaintiff's request to be let out of the car, Plaintiff did not call anyone, Pl. Dep. 194:2-4, but she received a call from a fellow employee, Dave Jolly.  Id. at 195:9.  Plaintiff testified that she was hysterical, and that Jolly was unable to understand what she was saying, so she hung up and began texting him.  Id. at 453:12-17.  She wanted Jolly "to know

that threats were being made to me.  I wanted somebody to know because I was scared I wasn't going to make it back to the office." Id. at 195:9-15.  She sent the following text: "In the car with Bryan, he was telling me how mean I am and stuff.  Then after he asked me what I was getting out of the meeting and he called me an idiot." Id. at 203:3-7.  She also texted "he won't let me out." Id. at 205:2-3.  She did not reference the inappropriate sexual comments, noting at her deposition that she "wasn't putting that in writing." Id. at 203:12-17.  DeAbreu testified that she did not call her direct supervisor because Kannett "was threatening me that he wasn't going to let me tell anybody, so I was too scared to call anybody and say anything because I didn't know what he was going to do." Id. at 195:21-25.

Meanwhile, Kannett was attempting to call management on his phone, but was not reaching anyone and, according to Plaintiff, "was just getting more and more angry." Pl. Dep. 197:4-12.  The entire time, Plaintiff was "begging him to let me out of the car and he was threatening me, and I told him that if he let me out I won't tell anybody." Id. at 197:13-16.  Kannett left a message for Jim McFadden, a supervisor, and finally made contact with someone at the office who Plaintiff later learned was Doug Milne.  Id. at 199:9-14.  Milne indicated that Kannett should not take DeAbreu home and said that Kannett should return to the office.  Kannett Dep.  66:22-25.  Milne later said that he didn't hear anything from DeAbreu during the conversation with Kannett and didn't realize she was in the car with him.  DeAbreu states that she did not call out or scream because "I was afraid for my life at the time.  I wasn't going to make a person threatening my life more angry." Pl. Dep. at 200:8-11.

Kannett did not stop to let DeAbreu out, but drove directly to the office.  Upon arrival, Kannett did not restrain DeAbreu in the car; she jumped out, ran into the office, and asked someone to find a manager. Pl. Dep. 461:7-15.  She told a co-worker about the incident and also spoke with

6

Human Resources Manager Sarah Hodes.  Def. 56.1 Stmt ¶24; Pl. 56.1 Resp. ¶24.  DeAbreu then left the office.

In the meantime, Kannett unsuccessfully tried to see Milne, then went to McFadden. Kannett Dep. 73:8-24.  McFadden called Hodes, and Kannett reported the incident to her. Id. at 74:2-5.  At approximately 1:54 p.m. on May 15, 2017, shortly after the incident, Kannett, acting on a suggestion from Hodes sent the following e-mail to DeAbreu:

> Good Afternoon Vanessa
>
> I wanted to take a minute to thank you for attending the sales call with me today at Blue Lynx.  It was clear throughout the meeting that your connection with the customer is a critical component to our continued relationship and success.
>
> I understand that my comment in car today upset you, and while I apologized at the time, I want to apologize again.
>
> You are a talented sales partner and I look forward to continuing to work with you in the future.

Def. 56.1 Stmt ¶42; Kannett Dep. at 76:5-16.

On May 16, 2017, DeAbreu filed a report with the police.  Police Statement, Rygiel-Boyd Cert., Ex. G.  According to her statement, DeAbreu and Kannett were near exit 62 of the LIE when she asked him to let her out of the car and he sped up, was going "really fast," and started to swerve.  She further referenced the 2013 Incident and said she "never reported the incident" because she was "told that it was pointless because Bryan was a top sales employee and he would never get into trouble."  Id.  She concluded that Kannett "needs to be arrested for what he did to me, this cannot happen to any one else."  Id.  Kannett was arrested at work a week after the 2017 Incident.  Kannett Dep. 115: 19-22.  At the station, Kannett was told he'd been arrested for unlawful imprisonment.  Id. at 116:12-16.  Three or four weeks after the arrest, Kannett was served

with a restraining order.  Id. at 94:17-95:3.  At some unspecified time later, Kannett took a plea to disorderly conduct.  Id. at 50:25-51:3.

Immediately after the incident, DeAbreu worked from home.  DeAbreu contends that she was made to work from home while Kannett was permitted to remain in the office, see  Pl. 56.1 Stmt. ¶25, while JCFP argues that it was DeAbreu who indicated that she would be unable to work because of the incident and only asked to return to the office after a week.  See  Def. 56.1 Resp. ¶25.

Plaintiff contends that Kannett made the comments, yelled at her and threatened her, but conceded that he did not touch her.  Pl. Dep. 206:17-23.  Kannett admits calling DeAbreu an idiot, but disputes making the other statements.  He also admits that DeAbreu asked to be let out of the car while they were on the LIE.

5.  JCFP Investigation and Action

Hodes led the investigation into the 2017 Incident.  Def. 56.1 Stmt ¶25.  During the investigation, Hodes: (a) spoke with Plaintiff on multiple occasions; (b) interviewed Kannett twice; (c) spoke with Milne, the manager Kannett called from the car; (d) spoke with Jolly and reviewed the text messages he had exchanged with DeAbreu; (e) interviewed McFadden; and (f) interviewed "several females in the office" who denied having had any sexual harassment issues with Kannett. See Pl. 56.1 Resp.  ¶¶25, 26, 29, 32–35.

Hodes testified as follows regarding the strategy she employed in questioning both DeAbreu and Kannett:

> Q:  During the course of this investigation, if any parts of Brian's and Vanessa's story didn't match up, did you ever ask the other one about what the first one said?
>
> A:  I don't recall specifically in what order.  As I said, I talked to Vanessa many times.  I talked to Brian a few times.  I don't recall if I specifically questioned that piece.

> Q:  Were there any pieces [of their stories] that you questioned?  Did you ever go to Vanessa and say, you know, Brian says or somebody else says this but you say that, to you have any explanation for that?  Did you ever say that to Vanessa?
>
> A:  I don't believe.
>
> Q: And vice versa to Brian.  If Vanessa said something that Brian didn't say, did you ever go to Brian and say what's the deal?
>
> A:  When I did talk to Brian about the specific allegations about the genitalia conversation, I said, did you make any inappropriate comments, and he said I just called her an idiot.  And I said, is there anything – as she now relayed to me that there was more to the story – I asked was there anything specific to your genitalia or body parts?  And he said, oh no, no, that didn't happen.  I think that's the only thing I really challenged him about.

Hodes Dep. 219:4-220:6.  Hodes did not question Kannett about his alleged statements regarding damage to his career or personal life, noting that she already had his statement "from his perspective."  Id. at 218:21-22.

During Hodes's investigation, one of the female employees reported that Kannett had made an inappropriate remark to her on one occasion several years earlier, but that after that employee told him to stop, he apologized and did not repeat the conduct.  Def. 56.1 Stmt ¶35.  That incident was resolved by the employee and Kannett, and no complaint was lodged with Human Resources. Id.[7]  Hodes was unsure if she spoke with Contrada about his conversation with DeAbreu prior to the car ride, but acknowledged that no such conversation was documented in her notes or in the final report.  Hodes Dep. 240:9-20.  Hodes found no evidence of a formal complaint regarding the 2013 Incident, but noted that not all complaints are required to be entered into the digital system. Id. at 75:18-19; 176:14-15; 188:14-17.

---

[7] The incident between this other female employee and Kannett was not reflected in Hodes' final report.  Hodes characterized this omission as "my mistake," but insisted that this incident was still "factored in" to the investigation. Hodes Dep. 251: 20-25.

In July 2017, Hodes submitted her Concluding Report (the "Report") to the Compliance Committee in which she concluded that the allegations of "inappropriate comment and refusal to allow Vanessa out of the vehicle have been substantiated," and that the allegation "of sexual misconduct cannot be substantiated."  Report at 1, Rygiel-Boyd Cert., Ex. J.  The Report indicates that as a disciplinary action, Kannett was issued a written warning, and that Kannett was transferred as a preventative action.  Id.  As to the unsubstantiated sexual misconduct allegation, Hodes made the following findings:

> that claim was not substantiated through any interview or investigation findings except for the statement from Vanessa herself.  Bryan has a long tenure with Tyco and credible reputation within the organization, his statement of denial of these allegations is found to be trustworthy and consistent with known facts. Vanessa's statement and allegations of Bryan's misconduct and behaviour while in the car varied between interviews.  In addition, Vanessa's own interaction, texting a co-worker, during the incident does not make mention of sexual misconduct as was reported, only inappropriate language and Bryan's refusal to let Vanessa out of the vehicle on the expressway. . .

Report at 4.

At the conclusion of the investigation in July 2017, Kannett was issued a written warning, which stated in pertinent part as follows:

> During the course of an investigation into an incident in your company vehicle on May 15, 2017, it was found that you acted in a manner not condoned by Tyco's Guide to Ethical Conduct. Specifically, using language in a manner that was unprofessional, calling a peer an "idiot."
>
> This behavior is not acceptable and prohibits our ability to foster a positive work environment for the team.  Additionally, the incident noted above is not in compliance with stated policies and procedures.
>
> Further violations of stated company policies may result in disciplinary action up to and including termination.

10

Rygiel-Boyd Cert., Ex. K.

It is undisputed that there has been no contact between DeAbreu and Kannett since the 2017 Incident, and that Kannett was transferred to the Syosset office while DeAbreu remained in Hauppauge.  DeAbreu questions whether Kannett's transfer was disciplinary.  In addition to the preventative action of transfer noted in the Report, Hodes testified that Kannett was transferred to the Syosset location "as a result of this investigation," Hodes Dep. 287:13-14.  Kannett's badge was still active for the Hauppauge office for evenings and weekends, but he needed to get approval from a manager if he needed to be in that office, id. at 287:15-24.  According to Hodes, Kannett was assigned to the Syosset office during the investigation and "that became permanent at the end of this investigation," id. at 288:14-17, and that the move was made to accommodate DeAbreu's safety concerns.  Id. at 288:20-24.  Kannett testified that he was never told that he was transferred to Syosset to keep him separated from DeAbreu, Kannett Dep.  94:11-16, and that "[t]he concept of me was to go to [Syosset] and help integrate sales between" the Syosset and Hauppauge offices. Id. at 16:15-21.

### 6.  Other Alleged Incidents at the Hauppauge Office

When asked at her deposition if, other than the 2013 and 2017 incidents with Kannett, there were "any other comment or thing that's been done to you and directed at you that you claim constitutes sexual harassment upon which you're relying in this lawsuit," Plaintiff responded "No."  Pl. Dep. 521:5-11.  Nevertheless, Plaintiff's papers contend that, in addition to the 2013 and 2017 Incidents, other incidents establish that JCFP's Hauppauge office has a "sexually charged" environment.

DeAbreu testified that she has been called a "bitch" by a co-worker—not Kannett.  Pl. Dep. at 306:17-22.  DeAbreu also cites to other conduct that was not directed at her.  Kannett admitted

that people in the office make sexual comments to each other and talk about how they look.[8]  Pl.

Opp/JCFP at 9.

At her deposition, Plaintiff also testified about the following incidents involving other co-

workers, but not Kannett:

- a male employee posted a video on his personal Facebook page of an exchange during CPR training where one male employee commented to another male employee "that's why you don't have a girlfriend," and then hit him in the groin;

- a male employee joked to a female employee, who was a close friend, by holding a rubber band at chest/head level and saying "look I got a rubber";

- an unidentified employee arranged "Beanie" toys on top of each other on a female employee's desk, which Plaintiff interpreted as being sexual in nature.

Def. 56.1 Stmt ¶¶45-47.  Plaintiff also maintains that other unspecified "sexually charged"

incidents occurred.  See Pl. 56.1 Resp. ¶¶45-47.  However, Plaintiff: (1) has not provided any

evidence regarding these, or any other, incidents: (2) does not argue that these incidents were

directed at her; and (3) has not suggested that complaints were filed about these incidents or that

management was aware of these incidents.

**B.  Procedural History**

Plaintiff filed her complaint on May 7, 2018, asserting four causes of action.  She claims

that she was discriminated against by JCFP by reason of gender, and subjected to a hostile work

environment in violation of Title VII and the NYSHRL.  She further asserts state law claims of

IIED against both JCFP and Kannett, and false imprisonment against Kannett.

---

[8] Kannett, however, also denied that people in office talked about sexual acts or about DeAbreu and her appearance. Kannett Dep. at 109:21-110:9.

Kannett and JCFP have each moved for summary judgment on all claims.  JCFP argues that: (1) Plaintiff cannot establish a hostile work environment claim where (a) the claim is based on two incidents, one of which is time-barred, occurring four years apart; and (b) the later incident by itself was not sufficiently severe or pervasive to establish a hostile work environment claim; (2) liability under Title VII or NYSHRL cannot be imputed to the employer based on conduct of a co-worker; and (3) her IIED claim is barred because it arises from workplace conduct with no claim of improper physical conduct.  See JCFP Brief in Support of Motion ("JCFP Mem."), ECF No. 44-2.  Kannett seeks judgment on the grounds that: (1) any claim for IIED arising from the 2013 Incident is time-barred; (2) the IIED claim as to the 2017 Incident fails because there is no evidence of sexual battery or improper physical contact; and (3) there can be no false imprisonment claim because DeAbreu voluntarily consented to ride in Kannett's car.  See Kannett Mem.

Plaintiff counters that there are questions of fact relating to seven issues: (1) the 2017 Incident and the interaction with Kannett; (2) why she was forced to be alone in a car with Kannett despite reporting to a manager that she was not comfortable with it; (3) the reporting and handling of the 2013 Incident; (4) whether or not Kannett was DeAbreu's co-worker or her "de facto" supervisor; (5) the completeness of JCFP's investigation; (6) JCFP's motive for moving Kannett to a different office after DeAbreu's complaints; and (7) whether the "general office culture" allowed Kannett to "feel entitled to harass" DeAbreu.  See Plaintiff's Brief in Opposition ("Pl. Opp/JCFP"), ECF No. 44-16.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

"Summary judgment must be granted where the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact

13

and the movant is entitled to judgment as a matter of law.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting FED. R. CIV. P. 56(a)).  In deciding a motion for summary judgment, "the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted); see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments" (internal quotation marks and citation omitted)).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies its initial burden, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006).  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (internal quotation marks omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  All facts under consideration must be directly supported by admissible evidence.  *See* FED. R. CIV. P. 56(c).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts" but rather "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original) (internal quotation marks omitted); see also Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (noting that "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact" (internal quotation marks and citation omitted)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252) (alterations in original)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

Moreover, "[w]here the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment."  Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has failed to make a sufficient showing on an essential element for which it bears the burden of proof).

15

With regard to summary judgment in employment discrimination cases specifically, the Second Circuit has said that:

> an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. . . Nonetheless, summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact.

Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted), abrogated on other grounds by Gross v. FBL Fin. Servs., 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009).  Despite this caution, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment").

## B.  Title VII

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  "[T]he kinds of workplace conduct that may be actionable under Title VII . . . include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" Redd v. New York State Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (alterations and omission in original) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). The statute's prohibition includes "the creation of a hostile work environment."  Vance v. Ball St. Univ., 570 U.S. 421, 133 S. Ct. 2434, 2441, 186 L. Ed. 2d 565 (2013).  Claims of a hostile work environment are governed by the same standard

16

under both Title VII and the NYSHRL.  See Summa v. Hofstra Univ., 708 F.3d 115, 124-25 (2d Cir. 2013).[9]

To establish a hostile work environment claim, a plaintiff must show that her workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013). The standard "has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015) (internal quotation marks and citation omitted).  In analyzing a hostile work environment claim, the court looks to the entire record, assessing the totality of the circumstances, and "considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)).

Typically, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citation omitted).  "However, there is neither a threshold magic

---

[9]  Plaintiff argues that a more permissive standard must be applied to her NYSHRL claim in light of amendments made to that statute in 2019.  See N.Y. EXEC. LAW § 300 (directing courts to construe the statute "liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL] have been so construed"). The disputed conduct at issue occurred prior to the change in the law, and "courts to date have held that the 2019 NYSHRL amendments are not retroactive." McHenry v. Fox News Network, LLC, 510 F. Supp. 2d 51, 69 (S.D.N.Y. 2020) No persuasive argument compelling a contrary ruling has been presented, and therefore the NYSHRL standard in existence prior to the amendments will be applied here.

number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (internal quotation marks, alteration, and citation omitted); see also Alfano, 294 F.3d at 379 (there is "no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment claim"). While even a single incident may create a hostile work environment, the incident must be "extraordinarily severe." Desardouin, 708 F.3d at 105; see also Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) ("simple teasing . . . offhand comments, and isolated incidents (unless extremely serious)" are generally insufficient to sustain a hostile work environment claim). Furthermore, the plaintiff must also demonstrate that the conduct occurred because of her protected state – in this case, her sex. See, e.g. Agosto v. New York City Dep't of Ed., 982 F.3d 86, 102 (2d Cir. 2020); see also Gorzynski, 596 F.3d at 102 (the court "must also consider the extent to which the conduct occurred because of the plaintiff's sex").

Prior to filing suit under Title VII, a plaintiff must first exhaust all administrative remedies by filing an EEOC charge. See Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 146 (2d Cir. 2012). "In New York, the statute of limitations for filing a charge with the EEOC is 300 days." Odom v. Doar, 497 F. App'x 88, 89 (2d Cir. 2012). "[O]nly incidents that took place within the timely [EEOC] filing period are actionable." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). The statute of limitations period "begins to run for each discrete discriminatory or retaliatory act when each act occurs." Levitant v. City of N.Y. Human Res. Admin., 625 F. Supp. 2d 85, 95 (E.D.N.Y. 2008).

Generally, each discrete discriminatory act is time barred if it is not filed within the requisite period of time, even if it is related to a timely filed charge, as "[e]ach discrete

discriminatory act starts a new clock for filing charges alleging that act." Morgan, 536 U.S. at 113. The nature of a hostile work environment claims differs in that the defendant is alleged to have engaged in one unlawful employment practice that persists over time through a series of repeated acts rather than occurring on a particular day, through a discrete, individual act.  In cases where the plaintiff alleges a "'continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  Dimitracopoulous v. City of N.Y., 26 F. Supp. 3d 200, 211 (E.D.N.Y. 2014) (quoting Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992)).  Thus, as long as one act occurs within 300 days of the filing of the EEOC complaint, the claim is timely, and liability may include all acts that contribute to the hostile work environment, even those that occurred outside the 300-day period.  See Morgan, 536 U.S. at 105 (as hostile work environment claims cover conduct that occurs "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own," the court may consider "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period" (internal citation omitted)).

Where incidents occur outside the 300-day limitations period, "the nature of the claim determines what consideration will be given to the earlier conduct." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010) (internal quotation marks and citation omitted).  Ultimately, whether the time-barred acts can be considered will depend on a determination of whether those acts "are part of the same actionable hostile work environment practice." Id., at 76 (internal quotation marks and citation omitted).

## III.  DISCUSSION

### A.  Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must establish: (1) that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer." Dillon v. Ned Mgmt., 85 F. Supp. 3d 639, 655 (E.D.N.Y. 2015) (internal quotation marks omitted).

#### 1.  Severe or Pervasive

To satisfy the first element, a plaintiff "must establish that the harassing conduct was "severe or pervasive"—not severe and pervasive. . . . The standard is disjunctive." Dillon, 85 F. Supp. 3d at 655 (emphasis in original) (citing Pa. State Police v. Suders, 542 U.S. 129, 146, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)).  She must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  Alfano, 294 F.3d at 374 (internal quotation marks and citation omitted).

Turning to the 2013 Incident, Defendants argue that any claim arising from that occurrence was not exhausted and is time barred.  The Court agrees.  Plaintiff did not file an EEOC charge concerning the 2013 Incident, and the time for filing such a charge has long since passed.  Despite the similarity between the 2013 and 2017 incident, the earlier event is too remote in time, without intervening conduct by Kannett, to warrant application of the continuing violation doctrine.  See, e.g., Bowen-Hooks v. City of N.Y., 13 F. Supp. 3d 179, 206 (E.D.N.Y. 2014) (finding "very similar" conduct by same harasser to be discrete discriminatory acts and declining to apply continuing violation theory, noting that "similarity alone is insufficient to render continuous what

is essentially two separate instances of alleged harassment separated by more than three years"). Accordingly, Plaintiff has no cause of action for relief arising from the 2013 Incident.  While that incident is not actionable on its own, however, it may still have evidentiary value as time-barred acts may be used as "'background evidence in support of a timely claim' of workplace discrimination." <u>MacMillan v. Millenium Broadway Hotel</u>, No. 09-cv-6053, 2011 WL 4357523, at *5 (S.D.N.Y. Sept. 16, 2011) (quoting <u>Morgan</u>, 536 U.S. at 113)); <u>see also</u> McGullam, 609 F.3d at 86 (Calabresi, J., concurring) ("alleged incidents that may not be considered for purposes of establishing liability for a hostile work environment, because they occurred outside the limitations period . . . nevertheless may be admissible and probative as background evidence to support a claim based on alleged conduct that falls within the limitations period").  Additionally, as discussed <u>infra</u>, the 2013 Incident—and Plaintiff's testimony that she complained about the incident to an HR employee—are still relevant to the question of whether JCFP can be held liable for the 2017 Incident.

The Court now turns to the 2017 Incident, which was timely raised.  Even in the absence of pervasive conduct over time, a single, severe incident may raise a hostile work environment claim sufficient to defeat summary judgment.  JCFP suggests that a single incident of sexual harassment may be sufficiently egregious to be "severe" only where there is physical contact between the harasser and the victim.  In support, it provides cases where a court, finding that the conduct at issue was not sufficiently severe, merely noted that there was no physical contact.  <u>See, e.g.</u>. <u>Sales v. YM & YMHA of Washington Heights & Inwood</u>, No. 00 CIV. 8641, 2003 WL 164276, at *6 (S.D.N.Y. Jan. 22, 2003) (a co-worker's comments regarding plaintiff's appearance and desirability as a husband do not objectively support a hostile work environment finding, noting that incidents were neither severe or pervasive and "considering that [the co-worker] never touched

21

plaintiff in any inappropriate way or subjected plaintiff to a practice of verbal abuse").  Many of the cases cited by JCFP stand for the proposition that persistent, unwanted attempts by a co-worker to enter into a relationship with plaintiff do not necessarily constitute a hostile work environment. See Clarke v. Pacifica Found., No. 07 CV 4605, 2011 WL 4356085, at *20 (E.D.N.Y. Sept. 16, 2011) (denying summary judgment on quid pro quo claim where there were questions of fact regarding whether sexual relationship between employee and supervisor was consensual, but granting summary judgment on the hostile work environment claim that was based on a month-long "workplace flirtation," a "demand" that Plaintiff visit Defendant's hotel room, and a "demand" that plaintiff accompany defendant to "discuss the ending of their 'relationship,'" finding those incident "not sufficiently severe or pervasive");  Feliciano v. Alpha Sector, Inc., No. 00 CIV. 9309, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (while co-worker's conduct "may well have breached the bounds of politesse," his "alleged unwelcomed romantic overtures towards [plaintiff]," including compliments, saying "he wanted to date her, attempt[ing] to hug her, stat[ing]  on one occasion that he wanted to 'lay with' [her], and, after having given her a ride home, kiss[ing]  her" are not actionable under Title VII); O'Dell v. Trans World Ent. Corp., 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (no hostile work environment where alleged harasser, while acting both as plaintiff's co-employee and her supervisor, "repeatedly asked her out. . . made comments about her appearance, sent her e-mails professing his love for her, called her at work and at home, invited her to tour New York City with him, gave her three gifts, and played her a song that she found offensive"), aff'd, 40 F. App'x 628 (2d Cir. 2002).

JCFP also cites a case in which the defendant employer was granted summary judgment in a single-incident circumstance where a male employee "actually exposed his penis to the plaintiff." JCFP Reply Brief at 11, ECF No. 44-32 (citing Johnson v. Xerox Corp., 838 F. Supp. 2d 99, 106

(W.D.N.Y. 2011)).  In that case, the female plaintiff was being trained as a cleaner by a male co-worker, and while standing by the sinks in a "Closed for Cleaning" restroom, another male employee came in and urinated in the urinal, exposing his penis in the process, telling plaintiff that "in Europe cleaning ladies just clean around me."  Johnson, 838 F. Supp. 2d at 102.  In granting summary judgment for the defendant, the court found that the incident was not sufficiently serious, noting, inter alia, that "Plaintiff does not allege any facts showing that the incident was physically threatening or humiliating," and that "[t]he urinating man did not intentionally expose himself directly to her, but, rather, was indifferent to her presence by the sinks while he was at the urinals." Id. at 106.  Despite JCFP's characterization of the occurrence in Johnson as "obviously much more severe" than Kannett's conduct during the 2017 Incident, it is readily distinguishable since Plaintiff here has alleged facts that may allow a jury to conclude that the conduct was directed specifically at her and that she felt physically threatened by the words and actions of Kannett.

JCFP has not provided any case law supporting its suggestion that a single incident must include touching to reach the necessary level of severity.  Incidents of sexual harassment are not amenable to being placed in neat buckets, and the lack of precedent setting forth a blanket rule requiring physical contact is unsurprising given the requirement that this Court look to the entire record and assess the totality of the circumstances.  While physical contact, or the lack of such contact, would certainly be a significant factor in assessing the severity of a harasser's conduct, it is not the only factor.  In the current case, it is undisputed that no touching took place; however, Defendant has not accorded any weight to the circumstances of the incident.  Viewing the facts in the light most favorable to Plaintiff, Kannett told Plaintiff—while they confined together in a car on the highway— "Hey, I want you to watch me play with my balls. . . . I am not asking you to touch it or them, I am just asking you to watch."  After Plaintiff objected, she was confined against

her will in a moving car traveling erratically and at a high rate of speed by an angry driver who refused her repeated demands to be let out.  A reasonable juror could, looking at the totality of the circumstances, conclude that Kannett's conduct was sufficiently egregious to establish Plaintiff's hostile work environment claim.[10]  Accordingly, a jury could conclude that this conduct was sufficiently severe to constitute a hostile work environment.

Because the Court finds that the evidence concerning the 2017 Incident alone is sufficient to defeat summary judgment, it is unnecessary to address the relevance of the other purported "sexually charged" conduct—not involving Kannett—that Plaintiff also cites in support of her hostile work environment claim.

2. Imputing Conduct to JCFP

The second element requires the plaintiff to establish "a specific basis . . . for imputing the conduct that created the hostile environment to the employer."  Dillon, 85 F. Supp. 3d at 656 (internal quotation marks and citation omitted).  Where the harasser is a "supervisor," the employer may be vicariously liable for that employee's unlawful conduct.  Vance, 570 U.S. at 431.   "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Id. at 424.

a. Supervisory Liability

An employer may be liable for an employee's actions where it empowered that employee "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Vance, 570 U.S. 431 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268, 141 L.

---

[10]The Court need not, and does not, find whether Kannett's conduct enacted in a non-restrictive environment, would be severe enough as a matter of law to establish a Title VII violation sufficient to defeat a summary judgment motion.

Ed. 2d 633 (1998)).  There is no evidence that Kannett had the authority to do any of these things.

In her opposition brief, Plaintiff notes that Kannett was a sales executive, "the highest level of

salesperson in the company," Pl. Opp/JCFP at 17, and concludes that there is a material question

of fact because Kannett had commented on the work performances of others.  Id. at 18.  The

evidence for this conclusion is Kannett's testimony regarding promotions in the Hauppauge office,

in which he stated that "[i]f I was asked a question if someone was doing a good job, I would

answer yes or no.  But I never gave a written recommendation, no."  Kannett Dep, 90:13-17.  As

to Plaintiff specifically, she offers that before the 2017 Incident, she sought Kannett's advice from

time to time.  Id. at 17.  Thus, at most, the evidence shows that Kannett was able to offer verbal

recommendations, when asked.  There is no evidence at all that he had supervisory power to take

action against any personnel, including DeAbreu.  Accordingly, liability may not be imputed to

JCFP on this basis.

### b. *Adequacy of the Response to the 2013 Incident*

Where the alleged harassment is perpetrated by a co-worker, a plaintiff must show that

the employer "either provided no reasonable avenue for complaint or knew of the harassment but

did nothing about it."  Willis v. Cty. of Onondaga, 710 F. App'x 47, 48 (2d Cir. 2018) (internal

quotation marks and citation omitted).  Once the employer is aware of the conduct, it must take

reasonable steps to remedy a hostile work environment.  "The standard for reviewing the

appropriateness of an employer's response to co-worker harassment is essentially a negligence

one, and reasonableness depends among other things on the gravity of the harassment alleged."

Summa, 708 F.3d at 125 (internal quotation marks and citation omitted).  "Whether the company's

response was reasonable has to be assessed from the totality of circumstances. Factors to be

considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature

of the employer's response in light of the employer's resources, and the nature of the work environment." Distasio v. Perkin Elmer Corp., 157 F.3d 55, 65 (2d Cir. 1998).

    "In the context of summary judgment, '[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate.'" Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 454 (E.D.N.Y. 2011) (quoting Gallagher v. Delaney, 139 F.3d 338, 348 (2d Cir. 1998), abrogated on other grounds by Burlington Indus., 524 U.S. 742); see also MacMillan, 2011 WL 4357523, at *5 ("Because there are often material issues of fact about the promptness and adequacy of an employer's remedial efforts, summary judgment is frequently not appropriate"); Sullivan v. Newburgh Enlarged Sch. Dist., 281 F. Supp. 2d 689, 707 (S.D.N.Y. 2003) ("[w]here a reasonable fact finder could conclude that an employer knew of harassment and failed to address it (because he did not respond reasonably and adequately to each of the incidents reported by a plaintiff), it is not appropriate for the court to make a determination as to the liability of the defendant employer").

    Plaintiff argues that there is a question of fact as to whether JCFP was aware of the hostile work environment prior to the 2017 Incident in light of her earlier complaint regarding the 2013 Incident. Plaintiff maintains that her complaint about similar conduct by Kannett in 2013 put JCFP on notice of a hostile work environment and that JCFP took no remedial steps to fix the problem.

    DeAbreu testified that she complained about the 2013 Incident to Aspromonti, a former HR Manager. According to DeAbreu, Aspromonti said she would talk to Kannett, and later told Plaintiff that "she took care of it." DeAbreu Dep. at 149:11–13, 153:12. DeAbreu did not have another issue with Kannett until the 2017 Incident.

Kannett, however, not only denied that the 2013 Incident ever occurred, but he also testified that no one at the company ever spoke with him about DeAbreu's complaint concerning this alleged incident.  Kannett Dep. 43:12-16.  Thus, although Aspromonti may have told DeAbreu that she would talk to Kannett and that "she took care of it," a jury could credit Kannett's testimony and conclude that, in fact, Kannett was never informed of DeAbreu's complaint and that the company took no action in response to her complaint.

As discussed supra, the 2013 Incident is not actionable on its own and, thus, the extent of JCFP's investigation and response to the 2013 Incident remediation is not relevant to impute liability to JCFP for the 2013 Incident.  However, the evidence recounted above is germane to the issue of notice to the company regarding Kannett's inappropriate behavior and whether, after DeAbreu's complaint about the 2013 Incident, JCFP took reasonable steps to prevent future inappropriate conduct by Kannett.  Resolving all factual ambiguities in Plaintiff's favor, she has raised a material question of fact on this point.  There are factual issues as to whether DeAbreu complained about the 2013 incident to Aspromonti and whether JCFP took any action in response to that complaint.  If these factual disputes are resolved in DeAbreu's favor, a jury could find that JCFP acted negligently in response to DeAbreu's 2013 complaint and that JCFP is liable for Kannett's similar conduct in 2017.

### c.  Adequacy of the Response to the 2017 Incident

Plaintiff also argues that JCFP can be held liable for the 2017 Incident because, after DeAbreu complained about the 2017 Incident, JCFP's response was inadequate.  Plaintiff contends, inter alia, that JCFP's investigation into her complaint was flawed and inadequate and that its response was also insufficient because, although Kannett was transferred, he was never told that his transfer was due to DeAbreu's complaint.  It is unnecessary, for purposes of resolving

the instant summary judgment motion, for the Court to determine whether JCFP can be liable for the 2017 Incident based on its subsequent response to that incident.  As explained above, the evidence concerning JCFP's response to DeAbreu's complaint about the 2013 Incident is sufficient, on its own, to defeat summary judgment and raise a factual question as to whether JCFP is liable for Kannett's conduct in 2017.

## C.  State Law Claim -- IIED

Plaintiff asserts claims of IIED against both JCFP and Kannett. Under New York law, "a claim for IIED requires a showing of '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" Rich v. Fox News Network, LLC, 939 F.3d 112, 122 (2d Cir. 2019) (quoting Howell v. N.Y. Post Co., 81 N.Y.2d 115, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." Restis v. Am. Coal. Against Nuclear Iran, Inc., 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014) (quoting Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996)).  The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Brown v. Sears Roebuck & Co., 297 A.D.2d 205, 212, 746 N.Y.S.2d 141 (N.Y. App. Div. 1st Dep't 2002) (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983) (internal quotation marks and citation omitted)).  It is a "highly disfavored [tort] under New York law" and is "to be invoked only as a last resort." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158 (2d Cir. 2014) (internal quotation marks and citations omitted; alteration in original).  Further, the New York Court of Appeals "has cautioned that a claim for IIED may not be sustainable 'where the

conduct complained of falls well within the ambit of other traditional tort liability.'" Id. at 159

(quoting Fischer v. Maloney, 43 N.Y.2d 553, 557–58, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217

(1978)).

The statute of limitations for claims of intentional infliction of emotional distress is one

year.  See N.Y. CPLR §215(3); Berlin v. Jetblue Airways Corp., 436 F. Supp. 3d 550, 565

(E.D.N.Y. 2020).  Thus, since any conduct occurring prior to May 7, 2017 is time-barred, the only

conduct for which a date has been provided that may support a timely claim is the 2017 Incident

involving Kannett.

1.   IIED Claim against JCFP

In her opposition, Plaintiff argues that she may recover against JCFP on a respondeat

superior theory.  Pl. Opp/JCFP at 21.  "An employer may be liable for the torts of an employee,

provided the relevant behavior fell within the scope of employment."  Turley, 774 F.3d at 161.

However, "New York courts consistently have held that sexual misconduct and related tortious

behavior arise from personal motives and do not further an employer's business, even when

committed within the employment context." Swarna v. Al–Awadi, 622 F.3d 123, 144–45 (2d Cir.

2010) (citation omitted); see also Higgins v. Metro-North R. Co., 318 F.3d 422, 426 (2d Cir. 2003)

("It is well settled that sexual harassment consisting of unwelcome remarks and touching is

motivated solely by individual desires and serves no purpose of the employer" (internal quotation

marks and citation omitted)); Girden v. Sandals Int'l, 262 F.3d 195, 205-06 (2d Cir. 2001) (noting

that "courts have held as a matter of law that an employer was not responsible for a sexual assault

committed by an employee because the attack was outside the scope of the employee's duties"

(collecting cases)).  Despite the fact that Kannett was returning from a sales call on company time

and driving in a company car, his alleged actions directed at DeAbreu clearly had no business

purpose but rather were personally motivated.  As such, Plaintiff may not recover against JCFP on a respondeat superior theory.  JCFP's motion for summary judgment on this cause of action is granted.

      2.  <u>IIED Claim against Kannett</u>

"[A] claim for IIED may not be sustainable where the conduct complained of falls well within the ambit of other tort liability." <u>Turley</u>, 774 F.3d at 157; <u>see also</u> <u>Moore v. City of N.Y.</u>, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) ("In New York, intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort, when traditional tort remedies are unavailable") (internal quotation marks and citation omitted)).  Accordingly, "IIED claims that are duplicative of other tort claims should therefore be dismissed." <u>McGrath v. Nassau Health Care Corp.</u>, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002).   Where a plaintiff raises an IIED claim based on facts supporting a false imprisonment claim, the IIED claim is properly dismissed as duplicative.  <u>See</u> <u>McCarthy v. Roosevelt Union Free Sch. Dist.</u>, No. 15CV01468, 2017 WL 4155334, at *4 (E.D.N.Y. Sept. 19, 2017) (dismissing IIED claim "as a matter of law because it overlaps with traditional tort theories of liability, namely, her false imprisonment claim" (internal quotation marks and citation omitted)); <u>Rubio v. Cty. of Suffolk</u>, No. 01-CV-1806, 2007 WL 2993830, at *5 (E.D.N.Y. Oct. 9, 2007) (dismissing IIED on summary judgment as duplicative of state tort claims for false arrest, false imprisonment, assault, and battery (collecting cases)).  The IIED claim against Kannett is also dismissed.

**D.  False Imprisonment Claim**

      Plaintiff asserts a state law claim for false imprisonment against Kannett only.  Under New York law, a plaintiff seeking to establish a false imprisonment claim must prove: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff

did not consent to the confinement, and (4) the confinement was not otherwise privileged. See McGowan v. U.S., 825 F.3d 118, 126 (2d Cir. 2016).  In his motion, Kannett argues that DeAbreu consented to the confinement and that his refusal to pull over on the LIE to let her out was "privileged" as such an act would violate state law prohibiting pedestrians on interstate highways. Kannett Mem. at 9 (citing N.Y. VEH. & TRAFFIC LAW § 1229-a).

Kannett's position is that Plaintiff entered his car voluntarily, and they drove directly from the customer's location in Yaphank to JCFP's office in Hauppauge.  Plaintiff does not dispute these arguments, but contends that a passenger is confined when she is unable to safely leave the vehicle, such as when it is moving.  The case law provided by the parties is slight.  Both cite a case from Hawaii where the appellate court reversed a directed verdict for defendant, finding that a jury could well have found "that her consent to go anywhere with the appellee [in his car] on the day in question was limited to going to the store and back" or that the "limited consent had expired." Noguchi v. Nakamura, 2 Haw. App. 655, 657, 638 P.2d 1383 (Haw. Ct. App. 1982).  Plaintiff further cites a case applying Maryland law and affirming the setting aside of a jury verdict in plaintiff's favor for false imprisonment where she consented to travel in the vehicle with other employees and there was no evidence that she "yielded to constraint of a threat, express or implied, or to physical force."  Faniel v. Chesapeake & Potomac Tel. Co., 404 A.2d 147 (D.C. 1979).

DeAbreu clearly consented to ride in Kannett's vehicle to return to the office; it is for a jury to decide, however, whether the scope of that consent included Kannett's alleged behavior, or whether she effectively revoked her consent by demanding to be let out of the car.  See generally Faniel, 404 A. 2d at 153 (noting that "[o]f course, if the defendant goes beyond the implied consent, and does a substantially different act, he will be liable. . . Whether the assent given was broad

31

enough to cover the invasion inflicted is a question of fact to be determined by the jury in doubtful cases" (citations omitted)).

Kannett suggests in his memorandum of law that he was barred by New York state law from acceding to DeAbreu's request to be let out of the car on the highway.  As Plaintiff points out, however, Kannett has offered different reasons for his actions, including that Milne told him not to let her out of the car, Kannett Dep. at 66:22-67:4, and, as he reported to Hodes, that he did not feel "comfortable" leaving her on the highway when the office "was only a few minutes away." Report at 3.  Furthermore, Kannett offers no reason why he could not have exited the highway at some point before the exit for JCFP's office and let her out, nor does he address why he did not pull over and offer to let her out immediately upon taking the exit for the office. These discrepancies raise additional questions best left to a jury.

**E.  Retaliation**

Plaintiff notes that JCFP failed to address her retaliation claim in its motion papers.  JCFP responds that it did not address a retaliation claim because Plaintiff has never made one.  Although she suggests that the complaint "includes claims for discrimination, inclusive of retaliation," Pl. Opp/JCFP, at 19 n.1, she states no separate retaliation claim, and a review of the complaint shows no language sufficient to put JCFP on notice that she was making such a claim.  Anticipating this determination, Plaintiff claims for the first time that she was retaliated against for raising the complaint against Kannett regarding the 2017 Incident and "requests leave to replead given that many of the retaliatory acts took place *after* the within lawsuit was filed."  Id. (emphasis in original).  Defendant JCFP argues that any retaliation claim is unexhausted, and that Plaintiff has failed to demonstrate good cause to support an eleventh-hour amendment.

Plaintiff alleges the following retaliatory actions taken against her as a result of her complaints:

- she was "subjected to comments by managers and co-workers that they should 'do something' to her in order to get promoted";

- she was "forced into a new role based on a lie, and not provided any training or guidance";

- she was told upon starting the new position "that she needed to find a female mentor";

- she "has been excluded and/or uninvited from essential meetings, so that Kannett can attend";

- she was told by a manager newly assigned to her that "he knew all about her and knew she was going to be difficult"; and

- she had "business and commissions taken away without valid explanation."

Pl. Opp/JCFP at 19 (citations omitted).

Leave to amend a complaint "should be freely given when justice so requires," FED. R. CIV. P. 15(a)(2), but whether to grant or deny leave to amend lies in the sound discretion of the court.  See McCarthy, 482 F.3d at 200.  Generally, a motion to amend should be denied "only for reasons such as undue delay, bad faith, futility of the amendment or prejudice to the other party." Crippen v. Town of Hempstead, No. 07–CV–3478, 2013 WL 2322874, at *1 (E.D.N.Y. May 22, 2013); see Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (per curiam) ("[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the nonmoving party").  Nevertheless, where a court has issued a scheduling order pursuant to Rule 16, such an order "may be modified only for good cause."  FED. R. CIV. P. 16(b). Thus, "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in

33

denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).

By Scheduling Order dated October 23, 2018, Magistrate Judge Arlene R. Lindsay set a deadline of January 11, 2019 "for joinder of additional parties or amendment of pleadings." Scheduling Order, ECF No. 26. The parties requested and received extensions of other deadlines including the discovery deadline and the time for commencement of summary judgment motion practice. See ECF Nos. 29, 31, 33; Elec. Orders of 4/5/19, 6/9/19, 7/15/19. There was no request, however, to extend the deadline to amend the complaint. As the deadline for amendment passed, it may be modified only for good cause shown. Plaintiff has presented no reason for the delay, much less a reason that would satisfy this requirement. As an exercise of its discretion, the Court denies Plaintiff's request for leave to amend her complaint.[11]

---

[11] In addition, Plaintiff has not provided a proposed amendment complaint, nor has she satisfactorily demonstrated that amendment would not be futile. She has provided only conclusory statements regarding actions "taken" against her at unspecified times by unidentified actors. These statements do not support a finding that any employment action taken was materially adverse or that she was injured. See,e.g.,Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24-25 (2d Cir. 2014) ("The requirement of a materially adverse employment action reflects the principle that Title VII does not protect an employee from all retaliation, but only retaliation that produces injury or harm" (internal quotation marks and citation omitted)). Furthermore, to the extent any of the retaliatory conduct was perpetrated by a co-worker, Plaintiff must prove that her employer "knew about but failed to take action to abate the retaliatory harassment." Brown v. Henderson, 115 F. Supp. 2d 445, 451 (S.D.N.Y. 2000), aff'd, 257 F.3d 246 (2d Cir. 2001). There is no evidence that Plaintiff ever reported any of the alleged retaliatory conduct to JCFP.

## IV.  CONCLUSION

For all the foregoing reasons, (1) Defendant JCFP's motion for summary judgment, ECF No. 44, is granted as to the IIED claim and denied as to the Title VII and NYSHRL claims, and (2) Defendant Kannett's motion for summary judgment, ECF No. 43, is granted as to the IIED claim and denied as to the false imprisonment claim.

**SO ORDERED**.

Dated: Central Islip, New York
        September 27, 2021


                                                    /s/  (JMA)
                                                   Joan M. Azrack
                                                   United States District Judge